# IN THE UNITED STATES DISTRICT COURT OF PENNSYLVANIA

## WESTERN DISTRICT

### C.A. No. 05-66 ERIE

**_ANTHONY McFERREN,_**
                    Petitioner

_vs._

**_SUPERINTENDENT TENNIS_**,
                    Respondent

## RESPONDENT'S BRIEF

Douglas W. Ferguson, Esq.
Crawford County Assistant District Attorney
Attorney for Respondent
Crawford County Court House
Meadville, Pennsylvania 16335
Telephone: (814) 333-7455
Attorney No.: 15589

# Table of Contents

*TABLE OF AUTHORITIES*..................................................................2

*ARGUMENT*.................................................................................4

*CONCLUSION*.........................................................................22

# TABLE OF AUTHORITIES

**Cases**

Antiterrorism and Effective Death Penalty Act of 1996, Pub.L.No. 104-132, 142 cong. Rec. H3305-01 (1996)("AEDPA")..................................................................... 12

*Barefoot v. Estelle*, 463 U.S. 880 (1983). ......................................................... 14

*Burkett v. Love*, 89 F.3d 135, 137 (3d Cir. 1996). .......................................... 15

*Carter v. Vaughn*, 62 F.3d 591, 594 (3d Cir. 1995 .......................................... 15

*Castille v. Peoples*, 489 U.S. 346, 351 (1989), .............................................. 15

*Chadwick v. Janecka*, 312 F.3d 597, 606-07 (3d Cir. 2002.............................. 18
*Chaussard v. Fulcomer*, 816 F.2d 925, 928 (3d Cir.), <u>cert. denied</u>, 484 U.S. 845 (1987)
.................................................................................................................. 16

*Christy v. Horn*, 115 F.3d 201, 206 (3d Cir. 1997)........................................... 15

*Doctor v. Walters*, 96 F.3d 375, 678 (3d Cir. 1996), ...................................... 15

*Duncan v. Henry*, 513 U.S. 364 (1995) ........................................................... 16

*Engle v. Isaac*, 456 U.S. 107 (1982) ................................................................ 14

*Evans v. Court of Common Pleas, Delaware County*, 959 F.2d 1227, 1230 (3d Cir. 1992), <u>cert</u>. <u>denied</u>, 506 U.S. 1089 (1993). ................................................... 17

*Gibson v. Scheidemantel*, 805 F.2d 135, 138 (3d Cir. 1986) citing *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981)............................................................................... 16

<u>*Hankins v. Fulcomer*</u>, 941 F.2d 246, 249 (3d Cir. 1991)................................. 16

*O'Halloran v. Ryan*, 835 F.2d 506, 508 (3d Cir. 1987)................................... 15

*O'Sullivan v. Boerckel*, ___U.S.___ 119 S.Ct. 1728, 1730 (1999) .................. 16

*Orban v. Vaughn*, 123 F.3d 727 (3d Cir. 1997), <u>cert</u>. <u>denied</u>, 118 S.Ct. 717 (1998); ...... 17

*Picard v.  Connor*, 404 U.S. 270, 275 (1971)................................................... 15

*Preiser v. Rodriguez*, 411 U.S. 475, 491 (1973)................................................ 15

*Rose v. Lundy*, 455 U.S. 509, 518 (1982) ........................................................................... 15

*Ross v. Petsock*, 868 F.2d 639, 643 (3d Cir. 1989) ............................................................ 15

*Smith v. Philips*, 455 U.S. 209 (1982); *Geschwendt v. Ryan*, 967 F.2d 877 (3d Cir.), *cert. denied*, 506 U.S. 977 (1992), *Zettlemoyer v. Fulcomer*, 923 F.2d 284 (3d Cir.), *cert. denied*, 502 U.S. 902 (1991). ............................................................................................ 14

*Story v. Kindt*, 26 F.3d 402, 405 (3d Cir. 1994). ............................................................... 15

U.S. Const. Amend. V (due process): U.S. Const. Amend. VI (right to counsel): *Stickland v. Washington*, 466 U.S. 668, 686 (1984) ("the right to counsel is the right to the effective assistance of counsel"). ....................................................................................... 14

*Wells v. Petsock*, 941 F.2d 253 (3d Cir. 1991), *cert. denied*, 505 U.S. 1223 (1992) ........ 14

*Werts v. Vaughn*, 228 F.3d 178, 204 (3d Cir. 2000). cert. denied, 121 S.Ct. 1621 (2001). ......................................................................................................................................... 19

*Williams v. Taylor*, 529 U.S. 362 (2000) ........................................................................... 18

*Wojtczak v. Fulcomer*, 800 F.2d 353 (3d Cir. 1986) .......................................................... 15

**Statutes**

28 U.S.C. § 2254(e)(1) ......................................................................................................... 18

28 U.S.C. § 2244(d) ............................................................................................................. 13

28 U.S.C. § 2254(b) ............................................................................................................. 15

28 U.S.C. § 2254(d), ............................................................................................................ 18

28 U.S.C. §2254(a) .............................................................................................................. 14

28 U.S.C. §2254(b) .............................................................................................................. 18

28 U.S.C. §2254(c) .............................................................................................................. 16

28 U.S.C. §2254(d)(1)(2) ..................................................................................................... 20

28 U.S.C. §2254(d)(1). ........................................................................................................ 19

28 U.S.C. §2254(e)(1) .......................................................................................................... 20

## ARGUMENT

## PROCEDURAL HISTORY AND RELEVANT FACTS

During the early morning hours of February 15, 1979, the Petitioner robbed the

Lil Shopper Convenience Store in Meadville, Pennsylvania during the commission of the

robbery. The Petitioner, Anthony McFerren, slit the throat of the victim, Curtis Durec,

causing his death. The matter was investigated by the Pennsylvania State Police and the

Petitioner was a suspect. On February 27, 1979, the Meadville City Police obtained a

statement from the Petitioner, Anthony McFerren. Thereafter, Petitioner McFerren was

arrested and charged with first-degree murder and robbery. The robbery and murder

charge were consolidated for trial. On May 16' 1979, the jury found the Petitioner,

Anthony McFerren guilty of murder of the first degree and guilty of robbery. On August

23, 1979, McFerren was sentenced to life imprisonment for murder and a consecutive

term of five to ten years for robbery.

On December 26, 1996, Petitioner filed a pro se post conviction relief act petition

pursuant to Pennsylvania Law. Counsel was appointed and an amended PCRA petition

was filed. After several arguments and evidentiary hearings, Crawford County Court of

Common Pleas President Judge Gordon R. Miller issued a memorandum and order dated

January 30, 2005. Judge Miller did not rule on the merits of the issues instead Judge

Miller granted Petitioners PCRA relief by reinstituting Petitioner's appellate's right and

permitted the Petitioner to file a direct appeal nunc pro tunc to the Superior Court. On

March 19, 2002, the Superior Court of Pennsylvania remanded the case back to the trial

court with instructions for the trial court to rule on the merit of the issues raised in the

Petitioner's state PCRA petition.  On December 10, 2002, President Judge Gordon Miller issued a memorandum and order ruling on the merits of the issues raised in the petition and denied the amended PCRA petition.  On December 17, 2002, Petitioner filed his timely notice of appeal to the Superior Court of Pennsylvania.  On September 12, 2003, the Pennsylvania Superior Court by memorandum and order affirmed the lower court's order denying McFerren's petition for post conviction collateral relief.  On October 6, 2003, McFerren filed a petition for allowance of appeal to the Pennsylvania Supreme Court.  On December 29, 2004, the Pennsylvania Supreme Court denied Petitioner's petition for allowance of appeal to the Pennsylvania Supreme Court.  On February 25, 2005, Petitioner McFerren filed the instant Federal Habeas Corpus Petition.

## FACTS OF CRIME

In the early morning hours of February 15, 1979, the Appellant entered the Lil Shopper store located on the corner of North Main Street and North Street in the City of Meadville.  The only employee on duty was the victim, Curtis Durec, age 19.  After robbing him at knifepoint, the Petitioner slashed and stabbed Durec in the throat with a knife.  Durec died as a result of these injuries.  When initially questioned by police, the Petitioner denied any involvement in the crime.  However, on February 27, 1979, the Appellant gave a transcribed statement to a court reporter in response to questions by Assistant District Attorney Donald Lewis from the Crawford County District Attorney's Office.  During that transcribed statement the Petitioner admitted his involvement in the robbery of the Lil Shopper and the death of Curtis Durec.  The cold-blooded killing of Curtis Durec is best described by the Petitioner himself in his transcribed statement of February 27, 1979.

It is as follows:

A.      Yes, we kept on talking and he pushed me a couple of times and he told me to get the hell out of the store and stuff like that, so then that's when I turned around with the knife and I cut him a little bit on his neck, you know.

Q.      Where did that happen?

A.      It was in the back.

Q.      In the back room or where the cooler was?

A.      Near the cooler.

Q.      Behind the pop in the cooler?

A.      Right.

Q.      In that room?

A.      Yeah.

Q.      Where did you get the knife?

A.      From in the sink.

Q.      In the sink, where in which room?

A.      Where they, you know, they have old, you know, it is like a face bowl in there, a sink or something in there.

Q.      In which room?

A.      On the left hand side.

Q.      Now the back rooms, there is a back room that has a toilet off the side?

A.      Right.

Q.      Then there is the room behind the coolers?

A.      Right.

Q.      Which room did you get it from?

A.      The one on the left.

Q.      This one over here (Indicating)?

A.      Right.

Q.      That would be the back room where all the empty pop bottles and stuff were?

A.      Yes, the empty ones were in there.

Q.      Where you would go into the bathroom, from that room?

A.      Yeah.

Q.      That's where you got the knife, but did you carry it over across and cut him over behind the coolers?

A.      We was arguing and fussing and stuff like that, yeah.

Q.      And you picked it up in this room and you didn't really cut him until you got over into the other room behind the coolers?

A.      Right.

Q.      Then you say you cut him in the neck?

A.      Right.

Q.      Did he bleed?

A.      Yeah.

Q.      Then what was he, all right?

A.      Yeah, he was all right.

Q.      Then what happened?

A.      We was still walking and, you know, he said, "Hey, man, I didn't mean for us to have no trouble," and he said, "Don't hurt me, man, I'll give you all the money we got in the store."

Q.      Okay.

A.      That's when he told me that, you know.  So, then we walked back there, you know, and we was still talking, this is all the back room, you know.  After we was in there, after I had cut him just a little bit, we was still arguing and stuff, and

7

he was in the back and then I turned my back and that's when he hit me with the bottle and cut my hand right here (Indicating).

Q.    He cut your hand where?

A.    Right here, just a small cut.  (Indicating)

Q.    That would be on the left knuckle, right above the left index finger?

A.    Yeah.

Q.    With a bottle?

A.    Right.

Q.    Did you bleed?

A.    Yeah.

Q.    Then where would that have happened?

A.    In the back room.

Q.    The room where the empty pop bottles were or behind the cooler?

A.    Where the bottles were.

Q.    You still had the knife, I take it?

A.    Yeah.

Q.    All right.  So far you had only cut him once?

A.    Yeah.

Q.    Then what happened after he cut you with the bottle?

A.    We kept on arguing and he said I had the advantage over him, and he said, "Hey, man, we don't have to go through all this.  I will give you all the money in the store," and we went back up and started getting the money out of the store.

Q.    He saw that you had the advantage over him with the knife?

A.    Right.

Q.    That's when he said cool it?

A.    "I will give you all the money in the store."

Q.    Okay, then what did you do?

A.    We walked up to the front and he opened the safe and stuff like that and got the money out.

Q.    Where was the safe?

A.    Up near the front of the store, right up under the rug.

Q.    Under the rug, behind the counter?

A.    Cash register, yeah.

Q.    Underneath the rug?

A.    Right.

Q.    How did he get to it?

A.    He just pulled the rug back.

Q.    How did he get the safe open?

A.    Opened it with a key.

Q.    Was it a combination safe, do you know?

A.    I think he just unlocked it, I am not really sure.

Q.    He was bleeding at that point, then?

A.    Right.

Q.    That's where the blood is coming from that was around the safe?

A.    Right.

Q.    And he reached in, did he?

A.    Yeah.

Q.    And got you the money?

A.    And put it all in a bag there.

Q.      What did you do with the bag?

A.      Just set the bag down on the floor.

Q.      After that happened, what went on next?

A.      All right, then we went back into the back room again.

Q.      Why?

A.      Why?  After we went back there, we was still talking, stuff like that, and he was still talking to me and we was fumbling around.

Q.      What was he talking about, Tony?

A.      He said, "Hey, Man, you don't have to hurt me or anything like that," and all this jazz, because I wasn't really planning on hurting him until he jumped and after he gave me the money he kept on talking to me like, you know, like, "I said you don't have to hurt me, nothing like that.  I gave you the money and all that stuff right there," and I explained to him – I said, "Hey man, I don't care about the money and all that jazz, I just want you to do square business with me."  And, we kept on arguing and kept on arguing.  That's when he tried to get the other bottle.  There was two bottles, and I knocked it out of his hand and that's when I turned around and jabbed him.

Q.      Where did you jab him?

A.      Right in the chest.

Q.      More than once?

A.      Yeah, a couple times.

Q.      This was in the back room, also?

A.      Yeah, yeah.

Q.      Then what happened?

A.      Then like I say, after I jabbed him, you know, then I saw he was bleeding and stuff, a lot and then he fell down, then I cut him.

Q.      You cut him around the neck, and why did you do it that time?

A.      Because I said, well, he gave me all this money and stuff like that and then he was going to report that I robbed him and stuff.

10

Q.    You figured what?

A.    I figured I had no other alternative.

Q.    Than to do what?

A.    Than to cut him, to kill him, whatever.

Q.    You did what?

A.    Then that's when I cut him on his neck.

Q.    You cut him on the neck, then?

A.    Right.

Q.    Then what happened after he fell down on the floor?

A.    Then he fell down on the floor.

Q.    Then what did you do?

A.    Then I jabbed him again, and then I heard somebody coming.

Q.    You jabbed him again when he was on the floor?

A.    Yeah.

Q.    Where did you jab him that time?

A.    Still on the chest.

Q.    Then you heard somebody coming?

A.    Right.

Q.    Then what did you do?

A.    I went up toward the front of the store and I waited on them.

Q.    Did you say anything to them when you first came out of the back room?

A.    Yeah, I said I was back there cleaning up something.

Q.    You told them what?

A.    I told them I was back there cleaning up some mess or something like that.

Q.    You had some blood on you at that point, didn't you?

A.    Right.

Q.    Then you came out and waited on him, did you?

A.    Right

Q.    Then after you waited on those people, what did they buy, by the way?

A.    I think one guy bought some papers or something like that and another guy bought some pop. I am not really sure what all they bought.

Q.    But you waited on them?

A.    Right.

Q.    Then what did you do?

A.    Then I went back in the back room again, I went back there looking at the dude, and I saw he was dead, and I grabbed the bag and booked out of the store.

Q.    Where had you left the bag?

A.    Still on the floor right by, like right here, the counter is here. It was right there by a refrigerator or something like that that had meat and stuff in it.

Q.    Then you grabbed the bag and left the store, then?

A.    Right.

## LIMITATION PERIODS FOR FEDERAL HABEAS CORPUS PETITION

In 1996, Congress amended the federal habeas corpus law to include a one-year limitations period for filing federal habeas corpus petitions. The Antiterrorism and Effective Death Penalty Act of 1996, Pub.L.No. 104-132, 142 cong. Rec. H3305-01 (1996)("AEDPA"), signed into law on April 24, 1996, included several major reforms to the federal habeas corpus laws. In Section 101 of the AEDPA, Congress imposed a new one-year limitations period applicable to state prisoners, which provides as follows:

(d)    (1)    A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of --

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the Untied States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2)    The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d) as (amended).

Pursuant to 28 U.S.C. §2254(d), it appears that Petitioner's instant Petition for Writ of Habeas Corpus was filed within the one-year statute of limitations. The statute began to run on October 28, 2004, when his judgment of conviction became final by the expiration of the time for seeking appellate review by the Supreme Court of the United States from his denial of his petition for review from the Supreme Court of Pennsylvania on September 29, 2004. His instant habeas corpus petition was filed on February 25, 2005. Thus, it appears the petition was filed within the one-year limitation period recognized by the courts cited above. However, if the calculations of the dates by the

Commonwealth are incorrect, it should not be deemed as a waiver of the defense under the statute of limitations.

## CLAIMS COGNIZABLE IN FEDERAL HABEAS CORPUS PROCEEDINGS

A state prisoner may seek federal habeas corpus relief only if he is in custody in violation of the United States Constitution or federal law. 28 U.S.C. §2254(a) *Smith v. Philips*, 455 U.S. 209 (1982); *Geschwendt v. Ryan*, 967 F.2d 877 (3d Cir.), *cert. denied,* 506 U.S. 977 (1992), *Zettlemoyer v. Fulcomer*, 923 F.2d 284 (3d Cir.), *cert. denied*, 502 U.S. 902 (1991). Violations of state law or procedural rules alone are not sufficient; a petitioner must allege a deprivation of federal rights before habeas relief may be granted. *Engle v. Isaac*, 456 U.S. 107 (1982), *Wells v. Petsock*, 941 F.2d 253 (3d Cir. 1991), *cert. denied*, 505 U.S. 1223 (1992). A federal court's scope of review is limited as it does not sit to retry state cases *de novo* but examines the proceedings in the state court to determine if there has been a violation of federal constitutional standards. *Barefoot v. Estelle*, 463 U.S. 880 (1983). A habeas petitioner must show that the state court's decision was such a gross abuse of discretion that it was unconstitutional; "ordinary" error is outside the scope of §2254.

McFerren's claims of tainted confession, failure of the trial court to instruct on self-defense, ineffective assistance of trial counsel, implicate rights guaranteed by the United States Constitution. *See*, U.S. Const. Amend. V (due process): U.S. Const. Amend. VI (right to counsel): *Stickland v. Washington*, 466 U.S. 668, 686 (1984) ("the right to counsel is the right to the effective assistance of counsel"). McFerren's bald underlying claims are cognizable in federal habeas corpus proceedings. However, those

claims are limited to those claims raised in his petition, which as previously indicated are

identical to the claims raised in his state PCRA proceedings and state appeal thereon.

## EXHAUSTION

Before a federal court addresses the merits of a state prisoner's claims,

constitutional and federal law issues first must have been fairly presented to the state

courts through direct appeal, collateral review, state habeas corpus proceedings,

mandamus proceedings, or other available procedure for judicial review. *See* e.g.,

*Castille v. Peoples*, 489 U.S. 346, 351 (1989), *Picard v. Connor*, 404 U.S. 270, 275

(1971), *Doctor v. Walters*, 96 F.3d 375, 678 (3d Cir. 1996), *Burkett v. Love*, 89 F.3d 135,

137 (3d Cir. 1996). 28 U.S.C. § 2254(b) exhaust all available state court remedies before

seeking federal relief. This exhaustion requirement serves to protect the interest of

comity, which ensures that the state courts have the first opportunity to address and

correct violations of state prisoners' federal rights. *Rose v. Lundy*, 455 U.S. 509, 518

(1982); *Preiser v. Rodriguez*, 411 U.S. 475, 491 (1973). Generally, in order to satisfy the

exhaustion requirement, "a state prisoner seeking federal habeas relief must present each

of his claims to the state's highest court." *Story v. Kindt*, 26 F.3d 402, 405 (3d Cir.

1994). *See also Wojtczak v. Fulcomer*, 800 F.2d 353 (3d Cir. 1986). The petitioner has

the burden of establishing that exhaustion has been met. *Ross v. Petsock*, 868 F.2d 639,

643 (3d Cir. 1989); *O'Halloran v. Ryan*, 835 F.2d 506, 508 (3d Cir. 1987).

Exhaustion is not a jurisdictional limitation, however, and federal courts may

review the merits of a state prisoner's claims prior to exhaustion when no appropriate

state remedy exists. *Christy v. Horn*, 115 F.3d 201, 206 (3d Cir. 1997), *Doctor*, 96 F.3d

at 681; *Carter v. Vaughn*, 62 F.3d 591, 594 (3d Cir. 1995). A petitioner shall not be

deemed to have exhausted state remedies if he has the right to raise his claims by any available state procedure. 28 U.S.C. §2254(c). Federal courts may entertain the merits of a petition for habeas corpus where state remedies have not been exhausted "when no appropriate remedy exists at the state level or when the state process would frustrate the use of an available remedy." *Story*, 26 F.3d at 405; *Hankins v. Fulcomer*, 941 F.2d 246, 249 (3d Cir. 1991). If the "petitioner has no opportunity to obtain redress in state court or where the state corrective process is so defective as to render any effort to obtain relief futile," exhaustion is not required. *Gibson v. Scheidemantel*, 805 F.2d 135, 138 (3d Cir. 1986) citing *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981). *See also Hankins*, 941 F.2d at 249-250 (exhaustion is excused if state process offers no hope of relief).

This Court's initial inquiry regarding the exhaustion requirement is whether a petitioner has "fairly presented" his federal claims to the state courts. To meet the fair presentation criterion, the same factual and legal bases for a claim must be presented to the state court to allow the state a reasonable opportunity to address the claim and correct any violation of federal rights. *Duncan v. Henry*, 513 U.S. 364 (1995) (*per curiam*). "Fair presentation requires that, before a particular claim may be asserted in federal court, the same method of analysis must have been made available to the state court." *Chaussard v. Fulcomer*, 816 F.2d 925, 928 (3d Cir.), cert. denied, 484 U.S. 845 (1987). The exhaustion requirement further requires a petitioner to properly present his claims to the requisite state courts. A petitioner must present every claim raised in the federal petition to the state's trial court, intermediate appellate court and highest court before exhaustion will be considered satisfied. *O'Sullivan v. Boerckel*, ___U.S.___ 119 S.Ct. 1728, 1730 (1999) ("...the state prisoner must give the state courts an opportunity to act

on his claims before he presents those claims to a federal court in a habeas [corpus] petition."); *Orban v. Vaughn*, 123 F.3d 727 (3d Cir. 1997), <u>cert</u>. <u>denied</u>, 118 S.Ct. 717 (1998); *Doctor*, 96 F.3d at 678; *Evans v. Court of Common Pleas, Delaware County*, 959 F.2d 1227, 1230 (3d Cir. 1992), <u>cert</u>. <u>denied</u>, 506 U.S. 1089 (1993).

Petitioner McFerren raises various grounds for habeas corpus relief: Ineffective assistance of counsel including failure to request a self-defense instruction; failure to call the Petitioner as a witness at his suppression hearing; failure to present a defense; failure to cross-exam "blood splatter" testimony' failure to procure expert testimony concerning the effects of alcohol on the Petitioner; failure to call one Richard Dennison as a witness; failure to object the review of the Petitioner's statement by the jury during its deliberations; failure of counsel to argue that his confession to the police was not voluntarily given; failure to object to the inference of malice from the use of a deadly weapon on the victim's body; violation of *Brady v. Maryland* with regard to the failure of the prosecution to turn over purported exculpatory evidence.

Petitioner, McFerren raised these identical issues in his original PCRA petition and amended petition filed with the state trial court. The trial court denied the Petitioner's request for post conviction relief, except granting him a direct appeal nunc pro tunc to the Superior Court of Pennsylvania. The Commonwealth asserts that McFerren was given the opportunity to address the same issues raised in his post conviction relief act petition on his direct appeal to the superior and Supreme Court of Pennsylvania. The Superior Court of Pennsylvania addressed those identical issues by memorandum and order dated September 12, 2003, wherein the Superior Court of Pennsylvania adopted in toto the lower court's extensive and exhaustive opinion denying

the Petitioner's post conviction relief act petition. Therefore, the Commonwealth asserts

that Petitioner, McFerren, has exhausted his state court remedies as required by 28 U.S.C.

§2254(b) with regard to all claims as stated in his petition.

## STANDARD OF REVIEW

"Under 28 U.S.C. § 2254(d), a federal court may grant habeas relief only if the

state court's decision was 'contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States,' Id. §

2254(d)(1), or was 'based on an unreasonable determination of the facts in light of the

evidence presented in the State court proceeding,' Id. § 2254(d)(2). [footnote omitted]

Moreover, a state court's factual findings are 'presumed to be correct,' and the habeas

petitioner carries the 'burden of rebutting the presumption of correctness by clear and

convincing evidence. ' 28 U.S.C. § 2254(e)(1)." *Chadwick v. Janecka*, 312 F.3d 597,

606-07 (3d Cir. 2002). In *Williams v. Taylor*, 529 U.S. 362 (2000), Justice O'Connor,

writing the opinion of the Court in Part II, discussed the independent meanings of the

"contrary to" and "unreasonable application" clauses contained within section

2254(d)(1).

> Under the "contrary to" clause, a federal habeas court may grant the writ if
> the state court arrives at a conclusion opposite to that reached by this
> Court on a question of law or if the state court decides a case differently
> than this Court has on a set of materially indistinguishable facts. Under
> the "unreasonable application" clause, a federal habeas court may grant
> the writ if the state court identifies the correct governing legal principle
> from this Court's decisions but unreasonably applies that principle to the
> facts of the prisoner's case.

*Williams,* 529 U.S.. AT 411-13.

The Supreme Court further clarified that a federal habeas court making the

unreasonable application inquiry should ask whether the state court's application of

clearly established federal law was objectively unreasonable.  Id. At 409.  "Under

§2254(d)(1)'s unreasonable application clause, then, a federal habeas court may not issue

the writ simply because that court concludes in its independent judgment that the relevant

state-court decision applied clearly established federal law erroneously or incorrectly.

Rather, that application must also be unreasonable."  Id. At 411.  These standards apply

also to mixed questions of fact and law, such as whether trial counsel provided effective

assistance of counsel.  *Werts v. Vaughn*, 228 F.3d 178, 204 (3d Cir. 2000). cert. denied,

121 S.Ct. 1621 (2001).

## PROCEDURAL DEFAULT

For a Federal Court to be forced to honor a state procedural default the last state

court decision must have clearly expressed that it was barred in review of a Federal

Constitutional claim by reliance on a state procedural rule.  A review of the last opinion

and order issued by the state appellate court, i.e. the Superior Court's decision of

September 12, 2003, does not express that opinion that it was barred in review of a

Federal Constitutional claim by reliance on a state procedural rule.  Therefore, the

Commonwealth asserts that Petitioner Ditch has not procedurally defaulted his Federal

habeas corpus claim.

## MERITS OF PETITIONER'S REMAINING CLAIMS

A Federal Court may not issue a writ of habeas corpus unless it includes that the

state court's adjudication resulted in the decision that was "contrary to", or an

"unreasonable application of", clearly established Federal law as determined by the

Supreme Court of the United States.  28 U.S.C. §2254(d)(1).  Determination of factual

issues made by a state court are presumed to be correct in a Federal court in a habeas

corpus proceeding initiated by a state prisoner. *See*, 28 U.S.C. §2254(e)(1). The

Petitioner has the burden of rebutting the presumption of correctness by clear and

convincing evidence.

A writ of habeas corpus petition should not be granted with respect to any claims

that were adjudicated on the merits in a state court proceedings. *See*, §2254(d). Unless

the adjudication of the claim resulted in decision that was contrary to clearly established

Federal law as determined by the Supreme Court of the United States or the adjudication

of the claim resulted in a decision that involved an unreasonable application of clearly

established Federal law as determined by the Supreme Court of the United States or the

adjudication of the claim resulted in the decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the state court preceding.

*See*, 28 U.S.C. §2254(d)(1)(2). The Commonwealth asserts that the prerequisites of

§2254 have been met by the Commonwealth of Pennsylvania in that all of the Petitioner's

Federal claims have been "adjudicated", "on the merits", "in state court proceedings".

Each and every one of McFerren's current claims in his Federal Habeas Corpus

Petition were raised in his state PCRA petition. More importantly, each of McFerren's

claims were thoroughly reviewed and decided by the state trial court in its opinion and

order of December 10, 2002, denying his state PCRA relief. In its memorandum and

order of October 6, 2003, the Superior Court of Pennsylvania adopted the lower court's

opinion and findings as its own. The Respondent in the instant habeas corpus petition

does likewise with regard to each issue raised by the Petitioner. A review of Judge

Gordon R. Miller's opinion of December 10, 2003, fully shows that the Petitioner's

habeas corpus petition is without merit and should be dismissed. The Respondent also

incorporates the pertinent portions of it brief filed at the state lower court level and

Pennsylvania Superior Court.  These may be referred to in the reproduced record filed in

this matter.  No further analysis or discussion is necessary to refute the Defendant's

federal habeas corpus claims stated in his petition.

# CONCLUSION

Over 26 years have passed since the brutal murder of Curtis Durec and the conviction of the Petitioner for first degree murder and robbery in causing the death of Curtis Durec in 1979. Maybe, just maybe, the law will say by denying Petitioner's habeas corpus petition this case is over. But alas, even then there is still the appeal.

Respectfully submitted,

DOUGLAS W. FERGUSON, ESQ.
Assistant District Attorney