**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ANTHONY McFERREN,** | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 05-66 E** |
| | ) | |
| **SUPERINTENDENT TENNIS, et al.,** | ) | **District Judge McLaughlin** |
| **Respondents.** | ) | **Magistrate Judge Baxter** |

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

**I.      RECOMMENDATION**

It is respectfully recommended that the Petition for Writ of Habeas Corpus be dismissed and that a certificate of appealability be denied.

**II.      REPORT**

This is a petition for writ of habeas corpus filed by a state prisoner presently incarcerated at the State Correctional Institution at Rockview, located in Bellefonte, Pennsylvania. Petitioner Anthony McFerren is serving a life sentence plus 5 to 10 years for first degree murder and robbery of a convenience store clerk on February 14, 1979. Petitioner asserts that his state court conviction is constitutionally infirm and seeks release. The Commonwealth has filed a perfunctory and inadequate response [Docket # 5], relying upon the state court briefing and providing no further analysis. The petition is now ripe for disposition.

**A.      Procedural History.**

Petitioner was convicted after a jury trial of one count each of First Degree Murder and Robbery on May 16, 1979. No timely appeal was filed. Petitioner's first attempt to file an appeal occurred on September 23, 1980, when he filed a petition for leave to file an appeal in forma pauperis and for the appointment of counsel. (RR at 418).[1] The petition was granted, and

---

[1] The initials "RR" refer to the reproduced record in this case.

counsel was appointed. (RR at 420).  On May 12, 1983, Petitioner filed a Petition for Leave to Appeal Nunc Pro Tunc (RR at 422) asserting that he requested a direct appeal but that trial counsel failed to file one on his behalf.  This motion was referred to court-appointed counsel. (RR at 426-27).  Petitioner's right to file a direct appeal was reinstated, but the appeal was dismissed by the Pennsylvania Superior Court for failure to prosecute on July 9, 1984. (RR at 428).

Petitioner's next attempt to appeal his conviction occurred more than twelve years later in a December 1996 petition for relief pursuant to the Post Conviction Relief Act (PCRA). (RR at 429-436).  Petitioner asserted that he believed his direct appeal had been pending since 1983, but had recently discovered that this was not the case.  The trial court dismissed the petition on March 17, 1997, finding that it was not filed timely. (RR at 438-441).  The Pennsylvania Superior Court reversed the trial court's dismissal of the PCRA petition on August 28, 1998, finding that the petition had been filed timely under state law. (RR at 449-456).  The Superior Court remanded the matter with directions to appoint new counsel and to address the claims raised in the PCRA petition. (RR at 456).

On remand, new counsel was appointed and an amended PCRA petition was filed on May 5, 1999, in which the following claims were raised:

1. Trial counsel was ineffective for failing to request a change of venue due to excessive negative media coverage;

2. Trial counsel was ineffective in failing to have Petitioner testify at his own suppression hearing;

3. Trial counsel was ineffective in failing to present a clear defense at trial;

4. Trial counsel was ineffective for failing to present expert medical testimony to counter the "blood spatter" evidence presented by the Commonwealth;

5. Trial counsel was ineffective for failing to obtain expert medical testimony about the physical and mental effects which may have occurred when Petitioner consumed alcohol and "speed" prior to commission of the offense;

6. Trial counsel was ineffective for failing to introduce photographs which showed cuts on Petitioner's head and knuckles which would

2

have supported his claim that an altercation with the victim led to the killing;

7. Trial counsel failed to present character witnesses to testify to Petitioner's reputation for peacefulness and non-violence;

8. Trial counsel was ineffective for failing to present the testimony of Richard Denson to the effect that the victim and Petitioner exhibited no animosity earlier in the evening, that Petitioner did not indicate a plan to rob the convenience store, and that Petitioner was intoxicated before going to the store;

9. Trial counsel was ineffective in failing to object to the trial court sending the 43-page transcription of Petitioner's statement out with the jury;

10. Trial counsel was ineffective for failing to request a jury instruction on self-defense;

11. Trial counsel failed to request a jury instruction that voluntary intoxication could reduce the degree of homicide;

12. Trial counsel failed to counter the Commonwealth's expert testimony that the victim's knife wounds were inflicted when he was kneeling or on the floor;

13. Trial counsel failed to argue to the jury Petitioner's statements to police were involuntary;

14. Trial counsel was ineffective in failing to object to the prosecutor's closing statement that Petitioner brought the murder weapon to the store that night;

15. Trial counsel was ineffective for failing to object to the prosecutor's statement during closing that Petitioner would be released after 15 years even if he were convicted of first degree murder;

16. Trial counsel failed to object to the court's answer to a jury question in which the court informed the jury they could infer premeditation from the insertion of a 6-inch knife into the victim's neck;

17. Trial counsel failed to file post-trial motions or a direct appeal;

18. Direct appeal counsel failed to file a brief in support of Petitioner's 1983 direct appeal, resulting in the dismissal of that appeal for failure to prosecute.

19. Petitioner was denied a jury representing a fair cross-section of the community.

3

(RR at 477-502). Argument on the motion was held on July 27, 1999, and Petitioner withdrew claims 1, 11, 12, 17 and 19. (RR at 524). The parties agreed that some issues could be resolved on the existing record, but that an evidentiary hearing was required with respect to other claims. (RR at 528; 583). Petitioner, by motion filed February 10, 2000, then withdrew issues 7, 14 and 15 (RR at 607-08). An evidentiary hearing was held on February 11, 2000, at which Petitioner, Petitioner's trial counsel, and former Assistant District Attorney Lewis testified. (RR at 610-727). An additional hearing addressing the issue of counsel's failure to file a direct appeal was held and, on January 30, 2001, the trial court entered an order finding that Petitioner had been denied his right to file a direct appeal, and granting him the right to file an appeal <u>nunc</u> <u>pro</u> <u>tunc</u>. (RR at 816). The trial court did not rule on the merits of Petitioner's other claims.

Petitioner filed an appeal from the partial grant and partial denial of PCRA relief in which he raised the ten claims which were finally presented to the PCRA court for review (2-6, 8-10, 16 and 18 above). (RR at 836). The Superior Court vacated the trial court's order and remanded "for the lower court to render findings of fact and conclusions of law, recognizing that this appeal is timely on the basis of our prior ruling in this matter." (RR 940).

On remand, the trial court concluded that, in light of the prior evidentiary hearings, the record was complete. An opinion denying relief was issued on December 10, 2002 (RR at 953-972), addressing issues 2-6, 8-10, 13, 16 and 18 from the amended PCRA petition. Petitioner appealed and presented the following claims for review:

1. Whether trial counsel was ineffective for failing to argue self-defense and to request a self-defense jury instruction?

2. Whether trial counsel was ineffective for failing to have Petitioner testify at his suppression hearing?

3. Whether trial counsel was ineffective for failing to identify for the jury exactly what Petitioner's defenses were?

4. Whether trial counsel was ineffective for failing to effectively cross-examine the prosecution's expert concerning its "blood spattering" theory, or, in the alternative, to secure a defense expert to testify to counter the prosecution's expert?

5. Whether trial counsel was ineffective for failing to have an expert testify concerning what physical and mental effects occur to a

4

> person who has consumed a large amount of drugs and alcohol over a short period of time?

> 6.    Whether trial counsel was ineffective for failing to have Richard Denson testify?

> 7.    Whether trial counsel was ineffective for failing to object to the trial court's decision to allow Petitioner's transcribed oral statement made to the police to be viewed by the jury during jury deliberations?

> 8.    Whether trial counsel was ineffective for failing to argue to the jury that Petitioner's statement made to police was involuntary?

> 9.    Whether trial counsel was ineffective for failing to be present in the courtroom when the jury came back asking for clarification of certain instructions, which prompted the trial court to issue a particular instruction the trial court initially refused to issue?

> 10.    Whether the prosecution failed to disclose to the defense an exculpatory photograph in violation of <u>Brady v. Maryland</u>?

(RR, Exhibit 63 at 9-10).  The Superior Court affirmed on the basis of the trial court's opinion on September 15, 2003. (RR, exhibit 65).[2]  Petitioner's subsequent petition for allowance of appeal was denied on September 29, 2004.

Petitioner filed the instant petition for writ of habeas corpus on February 25, 2005, and raises the same 10 claims presented in his final appeal before the Superior Court.

---

2.

Issue 10 raised on direct appeal is a <u>Brady</u> claim which had earlier been presented as issue 6 in the amended PCRA petition as an ineffective assistance claim.  Thus, the trial court did not rule upon the claim as a <u>Brady</u> claim, and the Superior Court's adoption of the trial court's opinion likewise does not specifically address <u>Brady</u>.  The consequences of petitioner's change of theory with respect to this claim will be discussed below.

B.      **Relevant Factual History**

1.      **The Suppression Hearing.**

Defense counsel filed a motion to suppress, and a hearing on the motion was held on May 8, 1979. (RR at 45-132). Detective Sergeant Arthur Pringle of the Meadville Police Department testified that a report of a murder at the 'Lil Shopper store was made at about 6:10 a.m. on February 15, 1979. ( RR at 49). Pringle was called to the scene and was informed that other officers found a trail of blood in the snow leading from the 'Lil Shopper to a corner within 65 feet of Petitioner's home. (RR at 50-51). In searching the general neighborhood, Officer Pringle saw a drop of blood on the outside of Petitioner's front door and what appeared to be a fresh blood stain on the curtain in a front window of the house. (RR at 51-52). Officer Pringle interviewed Karen Adams on February 16, 1979, who told Pringle she saw Petitioner with Richard Denson shortly before the murder occurred. (RR at 54-55). Mr. Denson confirmed that he took some beer to Petitioner at the 'Lil Shopper about 4:30 a.m. on February 15, 1979. (RR at 56). Another witness, Blaine Hall, told police that he was in the 'Lil Shopper shortly before 6:00 a.m. on February 15, 1979, and that a black male, who he later identified from a photo array as Petitioner, was standing behind the counter over a kneeling white male. (RR at 57, 59). Petitioner waited on Hall, but had to ask the white male the prices of the items. (Id.).

On February 26, 1979, the janitor at a local school found a brown sweater covered with blood. (RR at 61-62). Testing confirmed that the blood was the same type as the victim's. (Id.). The sweater was identified by both Richard Denson and Karen Adams as being similar to the one they saw Petitioner wearing on the night of the murder. (RR at 63-64). Based on the above-described evidence, a warrant was issued for Petitioner's arrest. (RR at 65).

The next witness was Assistant District Attorney Donald E. Lewis who confirmed that he actually served the arrest warrant on February 27, 1979, because he had prior dealings with Petitioner, who was already a suspect in the case. (RR at 86-87). Petitioner voluntarily agreed to accompany Lewis to the courthouse, and he was read the warrants and given his rights while in the car. (RR at 90-91). Lewis turned Petitioner over to Detectives Freeman and Stotlemyer of the City of Pittsburgh Police Department at 6:50 p.m. (RR at 91). At 9:10 p.m., Lewis was

informed that Petitioner had given an incriminating statement, including the location of the murder weapon. After waiting for a court reporter to arrive, Lewis participated in taking a transcribed statement from Petitioner beginning at about 10:00 p.m. (RR at 93-94). Miranda warnings were again given prior to the transcribed statement. (RR at 95).

Detective Freeman then testified that he read Petitioner his constitutional rights prior to interrogation, and Petitioner indicated that he understood his rights, but would answer questions without a lawyer present. (RR at 103-104). Petitioner initially denied any involvement in the crime. (RR at 104). Petitioner agreed to take a polygraph examination, which Detective Stotlemyer then administered. (RR at 105). Stotlemyer told Petitioner he had failed the examination, and accused Petitioner of having killed the victim. (RR at 106). Petitioner again denied involvement, but, at about 8:34 p.m., changed his mind and admitted that he was in the 'Lil Shopper, and that he had given the victim some pills to "get high," but the victim refused to pay for them. (RR at 109-110). An argument ensued, the victim hit Petitioner with a bottle, but Petitioner picked up a knife and cut the victim twice, superficially, after which the victim agreed to give Petitioner all of the money in the store. (RR at 110-111). Petitioner decided to kill the victim after being given all of the money, so he stabbed him repeatedly in the back room of the store. (Id.). Petitioner disposed of his bloody clothes in the storeroom of a local school, and he threw the knife near a garage. (RR at 111). Petitioner "ran through" the story again after Assistant District Attorney Lewis returned to the room, and then Freeman and Stotlemyer left. (RR at 112). Freeman testified that Petitioner appeared to understand his rights, and that he did not appear to be under the influence of any drugs at that time. (RR at 113).

A copy of Petitioner's transcribed statement was admitted into evidence at the hearing. It begins with a recitation of his rights and an express waiver of Petitioner's right to counsel (RR at 2-4). Petitioner then described how he smoked some marijuana cigarettes with the victim at the 'Lil Shopper store early in the morning hours of February 15, 1979. (RR at 12). Petitioner then called Richard Denson who dropped off some beer at the store. (RR at 14). Denson left and Petitioner and the victim drank beer, talked, smoked more marijuana, and then the victim asked to buy two "downers" from Petitioner. (RR at 15-17). Petitioner wanted $2 per pill, but the

victim did not pay him. (RR at 18). The victim told Petitioner to leave the store and pushed Petitioner, at which point Petitioner found a knife on the sink, picked it up and "cut him a little bit on his neck . . ." (RR at 19). The victim then offered to give Petitioner all of the money in the store. (RR at 21). Petitioner turned his back, and the victim hit him over the head with a soda bottle, cutting Petitioner's hand. (RR at 21-22). The victim, seeing Petitioner still had the knife, again offered to give him all the money in the store. (RR at 23). The victim opened the floor safe and gave Petitioner the money, at which point they returned to the back room. (RR at 24-25). The victim then began arguing again, and picked up another bottle which Petitioner knocked out of his hand. (RR at 25). Petitioner then stabbed the victim in the chest "a couple times," watched him fall down bleeding, and then "cut him" more while he was on the floor. (RR at 35-36). He did this because the victim "gave me all this money and stuff like that and then he was going to report that I robbed him and stuff." (RR at 26). He left the store after seeing that the victim was dead. (RR at 28).

### 2.        Evidence at Trial.

The evidence at trial included Petitioner's transcribed statement, as well as physical evidence including Petitioner's bloody sweater and blood taken from the door of Petitioner's home, from the 'Lil Shopper store, and from the street outside the store. (RR at 182). Also presented at trial was the testimony of Wilbur C. Thomas, M.D., Coroner of Crawford County, Pennsylvania. Dr. Thomas testified that the two arteries in the victim's throat were cut, with the right one being entirely severed. (RR at 207). Dr. Thomas testified that all of the blood was at floor level, even though a cut to the throat arteries could have resulted in blood spurting 10 to 15 feet. (RR at 34). On cross-examination, Dr. Thomas conceded that some of the minor wounds on the victim's body were consistent with a "scuffle." (RR at 219).

Petitioner testified that he consumed a fifth of whiskey the day before the killing. (RR at 227). He smoked marijuana with a friend in the evening, then he had some beer at a local bar. (RR at 329). During the evening, he stopped at the 'Lil Shopper and met the victim, who asked Petitioner if he knew where the victim could buy some marijuana. (RR at 331). After drinking

at a local bar, they stopped briefly at the 'Lil Shopper again, then left and drank more beer and smoked more marijuana. (RR at 333). He bought two pills from his friend and then drank more beer at the bar. (RR at 334-335). He went back to the 'Lil Shopper, at which time he was "really high" and smoked more marijuana with the victim and Richard Denson in the back room of the shop. (RR at 336). Petitioner and Denson left, but Petitioner went back later by himself around 2:00 a.m. (RR at 337).

Petitioner testified that the victim took the pills from him, but didn't pay him. (RR at 338). Petitioner asked to be paid, but the victim became upset, pushed Petitioner, and told him to leave. (RR at 338). The victim then broke a bottle, Petitioner picked up a knife from the sink and "jabbed" with it. (RR at 338-339). The victim then told Petitioner he could have "all the money in the store." (RR at 339). Petitioner was going to leave after being paid, but the victim came at him again with a broken bottle and cut Petitioner on the hand. (RR at 339). Petitioner noted that the police took pictures of the wound on his hand. (RR at 339). After arguing with the victim, Petitioner decided to accept the offer of the money because "I don't got no job" and they went to the front of the store and took the money from the safe. (RR at 340). Petitioner testified he had set the knife down at this point. (RR at 340).

After obtaining the money, Petitioner returned with the victim to the back room where the victim hit Petitioner with a bottle on the head. (RR at 342-343). Petitioner testified that he then grabbed the knife from the sink and defended himself, cutting the victim with the knife. (RR at 343). The victim was still trying to hit him with the bottle and that is when Petitioner took the knife "and carved him up." (RR at 344). Petitioner got scared, grabbed the money, and left the store. (RR at 344-345). Petitioner denied having any intent to rob the store when he went there (RR 351-352).

In his closing argument, defense counsel argued that Petitioner had no intent to kill, and did not premeditate the killing. (RR at 149-161). Counsel noted that Petitioner went to the store without a weapon, and argued that one does not plan a robbery without bringing a weapon. (RR at 149). Counsel also noted that Petitioner was high and drunk, as was the victim, and that this was a drug deal gone bad. (RR at 150-151, 153-154). Counsel stressed that Petitioner did not

intend to kill the victim and argued for a lesser degree of homicide. (RR at 156). Counsel also noted that the police found broken glass, which supported Petitioner's version of events about the victim attacking him with a broken bottle. (RR at 159). Finally, counsel asked the jury to consider Petitioner's state of mind, drunk and high, faced with what he viewed as a threat, and asked them not to convict Petitioner of intentionally killing the victim. (RR at 161).

### 3.    PCRA Hearing.

The February 11, 2000, PCRA hearing opened with Petitioner taking the stand. Petitioner testified that he requested counsel when police began to interrogate him, but that he was told he didn't need counsel. (RR at 629-630). He communicated this to trial counsel. (RR at 630). Petitioner also testified that officers coached him repeatedly on the answers he should give when the court reporter arrived to transcribe his statement. (RR at 632). On cross-examination, Petitioner conceded that he did not make this allegation during his testimony at trial. (RR at 656).

Petitioner maintained that the transcribed statement he gave to police did not accurately describe what occurred on February 15, 1979. (RR at 634). When asked to detail the alleged inaccuracies, he identified three: (1) police told Petitioner about patrons who came into the shop during the incident, but Petitioner did not recall waiting on them (RR at 636-637); (2) Petitioner maintained he was coached by police concerning the amount of money taken from the shop, which he did not remember at the time of his statement (RR at 637); and (3) police coached Petitioner not to talk about the victim striking him with a Tab bottle (RR at 638). Petitioner identified no other alleged inaccuracies.

Petitioner also testified that he was aware that police had a photograph of the injury to his hand, and that he informed counsel of the existence of this photograph (RR at 639, 642-643). With respect to the proposed testimony of Petitioner's friend Richard Denson, Petitioner testified that Denson would have confirmed the amount of drugs and alcohol Petitioner consumed prior to the murder. (RR at 650).

Petitioner recalled telling the jury that he acted in self-defense. (RR at 658). Although Petitioner testified to having used drugs repeatedly and to having consumed a large quantity of alcohol, he admitted on cross-examination that he was not so intoxicated as to be unable to recall in detail his actions of the entire night leading up to and including the killing. (RR at 661-662).

Petitioner's trial counsel, Anthony C. DeCello, Esquire, testified next, and stated that he believed Petitioner had a viable claim of self-defense. (RR at 670). He decided not to put Petitioner on the stand at the suppression hearing because he did not want him subjected to cross-examination at that time. (RR at 672). Attorney DeCello believed he was going to lose the suppression hearing anyway and did not want to risk putting Petitioner on the stand. (RR at 688).

Attorney DeCello testified that he chose not to cross-examine Dr. Thomas during trial because his direct testimony had not, in his mind, hurt the claim of self-defense. (RR at 675). Attorney DeCello recalled the argument made by the Commonwealth that blood would have splattered on the walls if the victim was standing when his throat was cut, and that the absence of blood on the walls supported a finding that the victim was kneeling or on the ground when his throat was cut. Attorney DeCello testified that he thought he was able to argue his version of the facts. (RR at 675-676).

Attorney DeCello testified that he did not call a toxicologist because he could not prove Petitioner's level of intoxication on the night in question. (RR at 678). He did recall having a prosecution witness, Blaine Hall, testify that Petitioner appeared drunk shortly before the killing. And, finally, Attorney DeCello testified that he did not object to Petitioner's transcribed statement going out with the jury because it corroborated Petitioner's trial testimony concerning an altercation and possible self-defense. (RR at 682).

Former Assistant District Attorney Donald E. Lewis also testified at the PCRA hearing. Attorney Lewis testified that Petitioner was repeatedly given his rights prior to his transcribed statement to police, and that he never suggested answers to Petitioner, nor did anyone else. (RR at 696-697).

**C.    Exhaustion and Procedural Default.**

**1.    Exhaustion**

Before a federal court addresses the merits of a state prisoner's claims, constitutional and federal law issues first must have been fairly presented to the state courts through direct appeal, collateral review, state habeas corpus proceedings, mandamus proceedings, or other available procedures for judicial review. See, e.g., Castille v. Peoples, 489 U.S. 346, 351 (1989); Picard v. Connor, 404 U.S. 270, 275 (1971); Doctor v. Walters, 96 F.3d 675, 678 (3d Cir. 1996); Burkett v. Love, 89 F.3d 135, 137 (3d Cir. 1996).   28 U.S.C. § 2254(b) requires a state prisoner to exhaust all available state court remedies before seeking federal relief.  This exhaustion requirement serves to protect the interest of comity, which ensures that the state courts have the first opportunity to address and correct violations of state prisoners' federal rights. Rose v. Lundy, 455 U.S. 509, 518 (1982); Preiser v. Rodriguez, 411 U.S. 475, 491 (1973).  Generally, in order to satisfy the exhaustion requirement, "a state prisoner seeking federal habeas relief must present each of his claims to the state's highest court." Story v. Kindt, 26 F.3d 402, 405 (3d Cir. 1994). See also  Wojtczak v. Fulcomer, 800 F.2d 353 (3d Cir. 1986).  The petitioner has the burden of establishing that exhaustion has been met. Ross v. Petsock, 868 F.2d 639, 643 (3d Cir. 1989); O'Halloran v. Ryan, 835 F.2d 506, 508 (3d Cir. 1987).

Exhaustion is not a jurisdictional limitation, however, and federal courts may review the merits of a state prisoner's claims prior to exhaustion when no appropriate state remedy exists. Christy v. Horn, 115 F.3d 201, 206 (3d Cir. 1997); Doctor, 96 F.3d at 681; Carter v. Vaughn, 62 F.3d 591, 594 (3d Cir. 1995).  A petitioner shall not be deemed to have exhausted state remedies if he has the right to raise his claims by any available state procedure.  28 U.S.C. § 2254©).  Federal courts may entertain the merits of a petition for habeas corpus where state remedies have not been exhausted "when no appropriate remedy exists at the state level or when the state process would frustrate the use of an available remedy." Story, 26 F.3d at 405; Hankins v. Fulcomer, 941 F.2d 246, 249 (3d Cir. 1991).  If the "petitioner has no opportunity to obtain redress in state court or where the state corrective process is so defective as to render any effort to obtain relief futile," exhaustion is not required. Gibson v. Scheidemantel, 805 F.2d 135, 138

(3d Cir. 1986) <u>citing</u> <u>Duckworth v. Serrano</u>, 454 U.S. 1, 3 (1981).  <u>See</u> <u>also</u> <u>Hankins</u>, 941 F.2d

at 249-250 (exhaustion is excused if state process offers no hope of relief).

### 2.    Procedural Default

In addition, a federal court may be precluded from reviewing claims under the

procedural default doctrine.  <u>Gray v. Netherland</u>, 518 U.S. 152 (1996); <u>Coleman v. Thompson</u>,

501 U.S. 722, 732 (1991); <u>Doctor</u>, 96 F.3d at 678; <u>Sistrunk v. Vaughn</u>, 96 F.3d 666, 678 (3d

Cir. 1996).  Like the exhaustion requirement, the procedural default doctrine was developed to

promote our dual judicial system; it is based upon the "independent and adequate state ground"

doctrine, which dictates that federal courts will not review a state court decision involving a

question of federal law if the state court decision is based on state law that is "independent" of

the federal question and "adequate" to support the judgment.  <u>Coleman</u>, 501 U.S. at 750.

A state's procedural rules are entitled to deference by federal courts and a petitioner's

violation of a state procedural rule may constitute an independent and adequate state ground for

denial of federal review of habeas claims.  <u>Id.</u>; <u>Sistrunk</u>, 96 F.3d at 673.  In order to prevent

federal habeas corpus review under the procedural default doctrine, a state procedural rule must

be "consistently or regularly applied."  <u>Banks v. Horn</u>, 126 F.3d 206, 211 (3d Cir. 1997),

<u>quoting</u>, <u>Johnson v. Mississippi</u>, 486 U.S. 578, 588-89 (1988).  Moreover, violations of a state's

procedural rules may constitute an independent and adequate state ground sufficient to invoke

the procedural default doctrine even where no state court has concluded that a petitioner is

procedurally barred from raising his claims.  <u>Glass v. Vaughn</u>, 65 F.3d 13, 15 (3d Cir. 1995),

<u>cert</u>. denied, 116 S.Ct. 1027 (1996); <u>Carter</u>, 62 F.3d at 595.  Federal habeas review is not

available to a petitioner whose constitutional claims have not been addressed on the merits due

to procedural default unless a petitioner can demonstrate: 1) cause for the default <u>and</u> actual

prejudice as a result of the alleged violation of federal law; or 2) that failure to consider the

claims will result in a fundamental miscarriage of justice.  <u>Coleman</u>, 501 U.S. at 750; <u>Carter</u>, 62

F.3d at 595.

### 3.    Exhaustion and Procedural Default Applied

Each of Petitioner's first nine claims was presented to the state courts in the context of his direct appeal, <u>nunc</u> <u>pro</u> <u>tunc</u>. Those claims were addressed on their merits. Thus, neither exhaustion nor procedural default bar consideration of Petitioner's first nine claims.

Petitioner's tenth claim, that a <u>Brady</u> violation occurred when the Commonwealth failed to produce a photograph of Petitioner's hand wound, requires more discussion. This claim was initially presented to the trial court as a claim of ineffective assistance due to counsel's failure to obtain the photograph, even though Petitioner told counsel that his hand had been photographed by police. The trial court rejected the claim, finding that the photograph would not have aided Petitioner's defense since, even if he had been cut on the hand (as he testified at trial), this would not have supported a self-defense claim. (RR at 965). On appeal to the Superior Court, Petitioner no longer framed the claim in terms of ineffective assistance of counsel. Instead, he argued that the Commonwealth failed to turn over the photograph constituting prosecutorial misconduct and a violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and its progeny. The Superior Court, however, merely affirmed the trial court's decision without addressing the <u>Brady</u> issue.

This interesting procedural posture leaves this Court with a claim that was not presented to the trial court, but which was also not disposed of by the state courts on the basis of waiver. Therefore, since the claim was presented to the Superior Court, and since the Superior Court purported to deny it on its merits, it appears that neither the exhaustion doctrine nor the procedural default doctrine bar this Court's consideration of Petitioner's <u>Brady</u> claim.

### D.    Standard of Review.

Section 2254 of the federal habeas corpus statute provides the standard of review for federal court review of state court criminal determinations. 28 U.S.C. § 2254. Specifically, a federal court must accord a presumption of correctness to a state court's factual findings, which a petitioner can rebut only by clear and convincing evidence. 28 U.S.C. § 2254(e). Where a state court's factual findings are not made explicit, a federal court's "duty is to begin with the

[state] court's legal conclusion and reason backward to the factual premises that, as a matter of reason and logic, must have undergirded it." Campbell v. Vaughn, 209 F.3d 280, 289 (3d Cir. 2000). In determining what implicit factual findings a state court made in reaching a conclusion, a federal court must infer that the state court applied federal law correctly. Id. (citing Marshall v. Lonberger, 459 U.S. 422, 433 (1982)).

A federal court may not issue the writ unless it concludes that the state court's adjudication resulted in a decision that was "contrary to," or an "unreasonable application of," clearly established federal law as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d)(1). In Williams v. Taylor, 529 U.S. 362 (2000), the United States Supreme Court discussed the independent meanings of the "contrary to" and "unreasonable application" clauses contained within § 2254(d)(1):

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Williams, 529 U.S. at 411-413. The Supreme Court further clarified that a federal habeas court making the unreasonable application inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. Id. at 409. "Under §2254(d)(1)'s unreasonable application clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

### E.    Discussion

#### 1.    Ineffective Assistance of Counsel

All but one of Petitioner's claims are framed in terms of ineffective assistance of counsel. The Sixth Amendment right to counsel exists "in order to protect the fundamental right

15

to a fair trial." <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 368 (1993) (quoting <u>Strickland v. Washington</u>, 466 U.S. 668, 684 (1984)).

> Thus the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial. Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated.

<u>Fretwell</u>, 506 U.S. at 369 (citing <u>United States v. Cronic</u>, 466 U.S. 648, 658 (1984)). <u>See also</u> <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 374 (1986) (the essence of a claim alleging ineffective assistance is whether counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect).

The Supreme Court has formulated a two-part test for determining whether counsel rendered constitutionally ineffective assistance: 1) counsel's performance was unreasonable; and 2) counsel's unreasonable performance actually prejudiced the defense. <u>Strickland</u>, 466 U.S. at 687. To determine whether counsel performed below the level expected from a reasonably competent attorney, it is necessary to judge counsel's challenged conduct on the facts of the particular case, viewed at the time of counsel's conduct. <u>Strickland</u>, 466 U.S. at 690. A petitioner who claims that he or she was denied effective assistance of counsel carries the burden of proof. <u>Cronic</u>, 466 U.S. at 658.

The first prong of the <u>Strickland</u> test requires a defendant to establish that his attorney's representation fell below an objective standard of reasonableness by committing errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. <u>Strickland</u>, 466 U.S. at 688. A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the totality of the circumstances, the challenged action "might be considered sound trial strategy." <u>Id</u>. at 689. The question is not whether the defense was free from errors of judgement, but whether counsel exercised the customary skill and knowledge that normally prevailed at the time and place. <u>Id</u>.

The second prong requires a defendant to demonstrate that counsel's errors deprived him of a fair trial and the result was unfair or unreliable. <u>Strickland</u>, 466 U.S. at 689. To prove

prejudice, a defendant must show that there is a reasonable probability that, <u>but for</u> counsel's unprofessional errors, the result of the proceeding would have been different. <u>Strickland</u>, 466 U.S. at 694 (emphasis added). A "reasonable probability" is one that is sufficient to undermine confidence in the outcome. <u>Id</u>.

**a.    Whether trial counsel was ineffective for failing to argue self-defense and to request a self-defense jury instruction.**

At trial, defense counsel argued that there was a "tussle" between Petitioner and the victim after the victim refused to pay for drugs. Counsel pointed out that Petitioner consistently told police that the victim used a broken bottle to attack him. (RR at159-160). He also argued to the jury that Petitioner did not bring a knife into the store, but picked it up from the sink in the store, and that the police confirmed that a broken bottle was at the scene, supporting Petitioner's version of events. (RR at 151, 159-160). Counsel argued that the statement made to police was the result of a frightened 19 year-old who said what the police wanted to hear. (RR at 152). Finally, counsel argued that it was clear that the victim did not believe himself to be in mortal danger because, if he had, he would have fled the store when a customer was standing at the counter buying some items. (RR at 154).

The trial court found that, while Petitioner "flirted with" a claim of self-defense, his testimony was not sufficient under Pennsylvania law to establish that defense. (RR at 966-968). More specifically, the court noted Petitioner's consistent testimony (in his statement to police, at trial, and during the PCRA hearing) that he had effectively disarmed the victim and could have exited the store. Instead, Petitioenr remained to "get paid" for the drug transaction and, after obtaining money, again followed the victim into the back of the store. (RR at 967-968). This, the court concluded, established that Petitioner was not free from fault in continuing the difficulty and, accordingly, he was not entitled to a charge on self-defense as a matter of Pennsylvania law. <u>See</u> <u>Commonwealth v. La</u>, 640 A.2d 1338, 1346 (Pa. Super. 1994)(defendant claiming self defense must establish that he did not continue difficulty, that he was in imminent fear of serious bodily injury or death, and that he did not have the opportunity to retreat to avoid

17

the confrontation).  The court also noted that Petitioner never testified that he was in imminent fear of serious bodily injury, and that Petitioner clearly did not avail himself of the opportunity to retreat to avoid the danger rather than to continue the confrontation. (RR at 968).  The trial court found that Petitioner did not lay the groundwork for a self-defense claim, and that he was not entitled to a jury instruction on it.

The trial court's recitation of the record is accurate.  Further, its conclusion that Petitioner did not present a valid claim of self-defense under Pennsylvania law is also supported by the record.  Even crediting Petitioner's testimony at trial, he clearly had the opportunity to leave without any danger on at least three occasions: (1) when he initially "disarmed" the victim; (2) after the victim emptied the safe; and (3) when he and victim went into the back room, prior to the victim (purportedly) hitting him with a bottle a second time.  Thus, trial counsel was not ineffective for failing to request an instruction, since such a request would have been denied. The trial court's conclusion in this respect is consistent with the <u>Strickland</u> standard and, accordingly, is neither contrary to nor an unreasonable application of applicable federal law.

Furthermore, since counsel would not have obtained an instruction on self-defense, he was not ineffective for failing to argue self-defense to the jury.  In fact, counsel did argue that no premeditation occurred, and that Petitioner lacked the requisite intent for either robbery or murder.  In making this argument, counsel alluded to the victim attacking the Petitioner.  While counsel did not specifically argue that Petitioner acted in self-defense, he did make an argument premised upon the facts at trial designed to further Petitioner's interest.

### b.    Whether trial counsel was ineffective for failing to call Petitioner as a witness at his suppression hearing.

Petitioner asserts that counsel should have put him on the witness stand during the suppression hearing and that the failure to do so constitutes ineffective assistance of counsel. The motion to suppress filed prior to trial asserted that Petitioner had not been adequately informed of his rights. (RR at 956).  There was no mention made in the motion, or at the suppression hearing, that Petitioner requested counsel, but was refused.  Furthermore, when

asked at trial, Petitioner did not assert that he requested counsel at the time of his statement to police, although he did testify that he was frightened by police. (RR at 350-351).

In ruling on this claim, the trial court recounted the record evidence that Petitioner was given his Miranda rights: (1) on the way to the police station; (2) prior to questioning by Detectives Freeman and Stotlemeyer; (3) prior to making a transcribed statement in the presence of a court reporter; and (4) the day after the transcribed statement was made. (RR at 956-958). The trial court also noted that counsel's reason for not putting Petitioner on the stand was that "he was getting free information as to what the district attorney's office was going to present [at trial] and he did not want the [Petitioner] subject to cross-examination at that time." (RR at 960). The trial court found that, while the claim of ineffectiveness had "arguable merit" in that counsel's decision not to have Petitioner testify did not appear to be reasonable trial strategy, the court nonetheless found that no prejudice occurred due to the evidence that Petitioner gave a voluntary statement after repeated warnings. (RR at 960). This Court agrees that, under the applicable standard, Petitioner has failed to establish that he was prejudiced by trial counsel's failure to present his testimony at the suppression hearing.

### c.    Whether trial counsel was ineffective for failing to present a defense at trial.

The trial court noted that counsel argued several things to the jury during his closing: (1) that the jury should not incarcerate a 19 year old for the rest of his life (seeking a sympathy verdict); (2) that Petitioner was under the influence of drugs and alcohol at the time of the killing (arguing against intent); (3) that there was no intent to kill because Petitioner did not take a weapon with him to the store; and (4) there was no robbery and no intent to rob because the money was given over voluntarily. (RR at 981). The trial court noted that counsel could have pursued these defenses with more vigor during closing, and that he could have explained them more clearly, but concluded that the outcome would not likely have changed (RR at 981). This is, again, a finding that counsel's alleged inadequacy did not cause constitutional prejudice to Petitioner.

19

Indeed, having already ruled that Petitioner would not have been entitled to a self-defense instruction, the best trial counsel could argue was that his client lacked the requisite intent. While this defense may have proved inadequate, this is more the result of the crime that was committed than of any ineffectiveness on counsel's part. Thus, Petitioner cannot establish that he was prejudiced by the defense that was put forth by his trial counsel.

**d. Whether trial counsel was ineffective for failing to effectively cross-examine the prosecution's expert concerning its "blood spattering" theory, or, in the alternative, to secure a defense expert to testify to counter the prosecution's expert.**

The coroner, Dr. Thomas, testified that cuts like the one to the victim's throat can result in blood spurting up to 10 to 15 feet. He also testified that all of the blood found at the scene was on the floor of the store, not on the walls. The Commonwealth used this evidence to argue that the deepest, and lethal, wounds were inflicted when the victim was either on the floor, or kneeling, thereby arguing against Petitioner's claim that he acted in self-defense. Dr. Thomas did not make any findings concerning the likely location of the victim when the wounds were inflicted.

Petitioner now maintains that his trial counsel should have cross-examined Dr. Thomas about his testimony, and/or that counsel should have presented expert testimony in opposition to Dr. Thomas. The trial court noted that the issue of when the victim's throat was cut was not clear at trial, leaving the parties to argue their respective theories. (RR at 984). The court also found that Petitioner "[gave] no basis to believe that further questioning of Dr. Thomas would adversely affect his credibility or result in positive evidence in support of the defendant's self-defense theory." (RR at 984). The court went on to note that Petitioner failed to identify any expert witness who would have been available to testify, or what the nature of that testimony would have been (RR at 984-985). The court found that Petitioner failed to establish prejudice from his counsel's alleged failings.

Again, the trial court applied the proper standard in finding that Petitioner failed to prove his claim of ineffective assistance. It should be remembered that Dr. Thomas did not offer an

20

expert opinion on the victim's position when the fatal wounds were inflicted. Instead, he merely noted some rather uncontroversial facts: (1) the victim's throat was deeply cut, and this was the wound that caused death; (2) when arteries are severed, the heart keeps pumping and blood may spurt up to 10 to 15 feet; and (3) no blood was found on the walls of the store. The Commonwealth then properly argued from this evidence the inference that the victim was likely not standing when the fatal wound was inflicted since blood would likely have hit the walls if this had been the case. Petitioner did not in the state court, and does not now, point to any expert testimony that could have been used to counter the three unremarkable factual statements made by Dr. Thomas. As a result, there is no evidence in the record that would support Petitioner's claim of ineffective assistance of counsel in this regard, and the trial court's conclusion is neither contrary to, nor an unreasonable application of, applicable law.

> **e.    Whether trial counsel was ineffective for failing to have an expert testify concerning what physical and mental effects occur to a person who has consumed a large amount of drugs and alcohol over a short period of time.**

"The right to counsel does not require that a criminal defense attorney leave no stone unturned and no witness unpursued." Berryman v. Morton 100 F.3d 1089, 1101 (3d Cir. 1996). Nevertheless, defense counsel does have a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. Strickland, 466 U.S. at 691. "[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id.

The trial court's analysis and ruling in this respect was brief:

> The defendant testified at trial about his consumption of these substances. He testified at the PCRA hearing in likewise fashion.
>
> All of this is hypothetical. Under Commonwealth v. Williams, supra, cited above, there is no showing that any such evidence was, or would be, available.

(RR at 985). The trial court properly noted that Petitioner failed to identify an expert in the state court who would have been available to testify, and he failed to identify the nature of such

testimony.  Moreover, Petitioner offered his own testimony at trial as to the amount and type of drugs and alcohol he consumed.  He was forced to concede at trial, however, that he recalled events clearly enough to remember all of his activities that night.  Nonetheless, trial counsel was able to elicit testimony from a Commonwealth witness that Petitioner appeared intoxicated just minutes prior to the killing.  Therefore, evidence of intoxication was presented to the jury, and counsel argued on the basis of this evidence.  Petitioner failed in the state court to present any evidence to support his claim that expert testimony would have been available, or that it would have materially aided his defense.  The state court's ruling was neither contrary to, nor an unreasonable application of, applicable law, since Petitioner has failed to carry his burden of establishing a reasonable probability that the result at trial would have been different.

**f.      Whether trial counsel was ineffective for failing to have Richard Denson testify.**

The record in this case shows that Mr. Denson was not present for the actual confrontation with the victim.  In fact, Petitioner argues only that Denson would have been able to confirm Petitioner's intoxicated state, since he drank and smoked marijuana with Petitioner hours prior to the murder.  In this respect, Denson's testimony would have been cumulative of both Petitioner's and Mr. Hall's testimony.  The trial court's conclusion that this claim does not merit relief is neither contrary to, nor an unreasonable application of, applicable law since, even with Denson's proposed testimony, it is not reasonably probable that the outcome at trial would have been different.

**g.      Whether trial counsel was ineffective for failing to object to the trial court's decision to allow Petitioner's transcribed oral police statement to be viewed by the jury during jury deliberations.**

This claim is premised upon Rule 1114 of Pennsylvania Rules of Criminal Procedure, which now prohibits Pennsylvania courts from sending a copy of a confession out with the jury. As the trial court notes, however, the rule at the time of trial was that it was permissible to send the transcript of a statement out with a jury, but that the practice should be "carefully

22

employed." (RR at 986).  An objection to the court sending the confession out with the jury

would have been meritless under state law. (RR at 987).  Thus, the trial court ruled that no

prejudice resulted because the transcribed statement was properly admitted into evidence at trial.

This was a proper application of the law of ineffective assistance of counsel, and Petitioner's

claim in this regard is without merit.  Parrish v. Fulcomer, 150 F.3d 326, 327 (3d

Cir.1998)(counsel will not be deemed ineffective for failing to present an argument without

merit).

**h.      Whether trial counsel was ineffective for failing to argue
to the jury that Petitioner's police statement was involuntary?**

Under Pennsylvania law, a defendant has the right to ask the jury to rule on the

voluntariness of his confession. Commonwealth v. Cunningham, 370 A.2d 1172, 1179 (Pa.

1977).  Here, counsel did not do so, although he presented evidence that Petitioner felt forced

into making statements and that he was frightened by the interrogation tactics used.  The trial

court concluded that such a challenge would not have changed the outcome at trial due to the

evidence of record that the statement was voluntarily given. (RR at 991).  As noted above, there

is substantial evidence of record, including an on-the-record waiver of the right to counsel and

acknowledgment of Petitioner's rights, supporting a finding that Petitioner's statement was

voluntary.  Petitioner cannot establish the likelihood of a different result had his trial counsel

attempted to argue that the police statement was given involuntarily.  Consequently, he cannot

establish that counsel rendered  ineffective assistance in failing to submit this issue to the jury.

**i.      Whether trial counsel was ineffective for failing to be
present in the courtroom when the jury asked for
clarification of certain instructions, which prompted
the trial court to issue a particular instruction it
initially refused to issue.**

As a general matter, states are free to set definitions of criminal offenses.  Smith v. Horn,

120 F.3d 400, 414 (3d Cir. 1997).  "However, once the state has defined the elements of an

offense, the federal Constitution imposes constraints upon the state's authority to convict a

person of that offense." Id.  Specifically, the Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).  Thus, a "jury instruction that omits or materially misdescribes an essential element of an offense as defined by state law relieves the state of its obligation to prove facts constituting every element of an offense beyond a reasonable doubt, thereby violating the defendant's federal due process rights." Smith, 120 F.3d at 415; see also Sandstrom v. Montana, 442 U.S. 510, 523, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).  In this respect, jury instructions only become constitutionally defective when there is a *"reasonable likelihood* that the jury has applied the challenged instructions in a way that violates the Constitution." Smith, 120 F.3d at 411 (emphasis in original) (quoting Estelle v. McGuire, 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) and Boyde v. California, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990)).  A court's analysis of challenged instructions "must focus initially on the specific language challenged." Smith, 120 F.3d at 411.  After that, the "allegedly constitutionally infirm language must be considered in the context of the charge as a whole." Id. Thus, to put this in terms of the ineffective assistance claim presently raised, counsel could not have rendered ineffective assistance unless he permitted a constitutionally infirm jury instruction to be given without objection.

Here, in its initial charge to the jury, the trial court instructed the jury that it could infer the malice necessary for a conviction of first degree murder from the use of a deadly weapon to a vital part of the body. (RR at 388).  After a question from the jury, the court again defined the elements of murder and, with respect to malice, stated:

> Now, an intention to kill may be inferred from the surrounding circumstances, and one of the things that you can consider as to whether there was an intention to kill is the use of a deadly weapon against a vital part of the body.
>
> Now, you would have the right to infer that when a person uses a weapon such as we had in this case, a six-inch knife, against a vital part of the body, that is the throat and the arteries in the neck, that an inference arises that he intended to kill.

(RR at 408-409).  Upon review, the trial court concluded that the instruction given after the question from the jury was an accurate statement of Pennsylvania law (RR at 992).  Indeed, this is the case. Commonwealth v. Lee, 585 A.2d 10841088 (Pa.Super. 1991)(use of deadly weapon against vital part of body sufficient to find malice for purposes of first degree murder).

The instructions given to the jury, both during the initial charge and after the jury question, were accurate statements of the law of Pennsylvania.  There would have been no basis for objection and counsel's failure to object to the jury instruction could not have caused prejudice to Petitioner.

### j.    Brady claim.

Petitioner argues that the photograph of his hand would have supported his version of events and, thus, the Commonwealth's failure to disclose the photograph prior to trial was a violation of its duty to disclose exculpatory evidence pursuant to Brady v. Maryland, 373 U.S. 83 (1963).  In ruling on the ineffective assistance claim raised before it, the trial court found that counsel was not ineffective in failing to introduce the photograph because it would not have aided Petitioner.  Specifically, the court found that, even if Petitioner's hand was injured by the victim during an altercation, this would not have "justified the killing of another human being" and would not have established a self-defense claim.  This factual finding is likewise dispositive of the Brady claim, which was first presented by Petitioner to the Superior Court.

To state a valid Brady claim, a petitioner must show that the evidence was (1) suppressed, (2) favorable, and (3) material.  Here, there is no indication that counsel ever requested the photograph, although Petitioner was aware that a picture had been taken of his hand.  It appears that the first part of the test is not met, since there is no evidence that the Commonwealth suppressed the photograph.  Further, while a photograph of the injury would have supported Petitioner's testimony concerning the injury to his hand and, thus, may be seen as being "favorable" to him, Petitioner cannot meet the third part of the test.  Evidence is material for purposes of Brady where a reasonable probability exists that the outcome would have been different had the evidence been disclosed.  Riley v. Taylor, 277 F.3d 261, 301 (3d

Cir.2001) (en banc).  Petitioner testified at trial, without contradiction, that his hand was injured by the victim during an altercation.  He also testified, however, that this occurred some time before he actually inflicted the mortal wounds on the victim.  Thus, evidence of the wound was before the jury, making the photograph cumulative evidence.  Moreover, the trial court correctly found that proof of the existence of the wound would not have provided a viable defense in this case.  As a result, the photographic evidence was not "material" for purposes of <u>Brady</u>.

### F.    Certificate of Appealability

Section 102 of the Antiterrorism and Effective Death Penalty Act (28 U.S.C. § 2253(as amended)) codified standards governing the issuance of a certificate of appealability for appellate review of a district court's disposition of a habeas petition. Amended Section 2253 provides that "[a] certificate of appealability may issue ⋯ only if the applicant has made a substantial showing of the denial of a constitutional right." Where the federal district court has rejected a constitutional claim on its merits, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong ⋯" <u>Szuchon v. Lehman</u>, 273 F.3d 299, 312 (3d Cir.2001) quoting <u>Slack v. McDaniel</u>, 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000).  A petitioner meets this standard if he can show that the issue "is debatable among jurists, or that a court could resolve the issue differently, or that the question deserves further proceedings." <u>McCracken v. Gibson</u>, 268 F.3d 970, 984 (10 Cir.2001).  Under 28 U.S.C. § 2253(c)(3), the district court must identify which specific issues satisfy the standard.  Because petitioner has not made such a showing, a certificate of appealability should be denied.

### III.    CONCLUSION

For the foregoing reasons, it is respectfully recommended that the instant petition for writ of habeas corpus be dismissed and that a certificate of appealability be denied.

In accordance with the Magistrates Act, 28 U.S.C.  § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrates, the parties are allowed ten (10) days from the date

of service to file written objections to this Report and Recommendation.  Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.


/s/Susan Paradise Baxter
SUSAN PARADISE BAXTER
Chief U.S. Magistrate Judge


Dated:  November 6, 2006